

IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON

DATE DEC 0 6 2018

*[signature]*
CHIEF JUSTICE

This opinion was filed for record

at *8:00am* on *Dec 6, 2018*

*[signature]*
SUSAN L. CARLSON
SUPREME COURT CLERK

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| MICHAEL E. MURRAY, | ) | No. 95251-5 |
| Petitioner, | ) | |
| v. | ) | |
| | ) | En Banc |
| STATE OF WASHINGTON, DEPARTMENT OF LABOR AND INDUSTRIES, | ) | |
| Respondent. | ) | Filed DEC 0 6 2018 |

MADSEN, J.—This case concerns interpretation of the Health Technology

Assessment program (HTA or Act) and, specifically, the impact of the Health

Technology Clinical Committee (HTCC) coverage determinations regarding workers'

compensation claims in light of the requirements of the Industrial Insurance Act (IIA),

Title 51 RCW. As discussed below, we harmonize the HTCC legislation with the IIA. In

doing so, we reverse the Court of Appeals and remand petitioner Michael Murray's

reimbursement claim to the Washington Department of Labor and Industries (L&I or

Department) for a hearing on the merits. We also award Murray attorney fees on appeal.

FACTS

Overview of HTCC Legislation

In 2006, the legislature enacted legislation establishing a state health technology assessment program. *See* LAWS OF 2006, ch. 307 (Engrossed Second Substitute House Bill 2575 (E2SHB 2575)), codified as chapter 70.14 RCW. Part of that legislation formed the HTCC as an independent committee to judge selected medical technology and procedures by their safety, efficacy, cost-effectiveness, and health outcomes. RCW 70.14.080-.130. The HTCC is an independent committee of 11 practicing medical professionals. RCW 70.14.090(1). The HTCC evaluates medical evidence in determining which health technologies and procedures the State will cover and, "if covered, the criteria which the participating agency administering the program must use to decide whether the technology is medically necessary, or proper and necessary treatment." RCW 70.14.110(1)(b). Participating state agencies are the Health Care Authority (HCA), L&I, and the Washington Department of Social and Health Services (DSHS). RCW 70.14.080(6). The legislature created the independent "statewide" HTCC to incorporate evidence-based medicine into the decision-making process about what technologies and procedures the State would fund. *See* FINAL BILL REPORT ON E2SHB 2575, at 2-3, 59th Leg. Reg. Sess. (Wash. 2006).[1]

The HTCC reviews a procedure or technology when there are concerns about its safety, efficacy, or cost-effectiveness, especially relative to existing alternatives; or

_____

[1] Located at http://lawfilesext.leg.wa.gov/biennium/2005-06/Pdf/Bill%20Reports/House/2575-S2.FBR.pdf [https://perma.cc/8UPV-SKME].

significant variations in its use. RCW 70.14.100(1)(a). The HTCC obtains a report from an evidence-based research center and requires the researchers to evaluate evidence related to a medical procedure's safety, health outcome, and cost data, and evidence submitted by any interested party. RCW 70.14.100(4)(a), (c). The HTCC then considers the "evidence regarding the safety, efficacy, and cost-effectiveness of the technology as set forth in the systematic assessment conducted under RCW 70.14.100(4)," public comment, and expert treatment guidelines to determine the conditions under which the State should cover a procedure. RCW 70.14.110. The legislation generally provides that participating agencies comply with HTCC determinations. *See* RCW 70.14.110(1), .120(1); *see also* FINAL BILL REPORT E2SHB 2575, at 3 ("Participating state agencies will comply with clinical committee *recommendations, unless they violate* federal law or regulations, or *state law*." (emphasis added)). If the HTCC covers a treatment, the HTCC's coverage criteria establish what participating agencies must use to decide medical necessity. RCW 70.14.110(1).

The HTA provides transparency and independence in the HTCC's decision-making process. Specifically, the Act provides that in making its determination, the committee shall consider, "in an open and transparent process," evidence about the safety, efficacy, and cost-effectiveness of the particular technology. RCW 70.14.110(2)(a). The committee must provide an opportunity for public comment. RCW 70.14.110(2)(b). The committee meetings and any advisory group meetings are subject to the Open Public Meetings Act of 1971, chapter 42.30 RCW. RCW 70.14.090(4). The committee members may not contract with or be employed by a health technology

manufacturer or a participating agency during their term or for 18 months before the appointment, and each member must agree to terms and conditions regarding conflicts of interest. RCW 70.14.090(3)(a). The HTCC's coverage determinations must be reviewed at least once every 18 months if evidence has since become available that could change a previous determination. RCW 70.14.100(2). As noted, the HTCC's coverage determinations apply to L&I, HCA, and DSHS and thereby provide a measure of uniformity in the provision of health care services. RCW 70.14.080(6). Those agencies generally "shall comply" with HTCC coverage determinations. RCW 70.14.120(1).

Two provisions of the HTA concern review. RCW 70.14.120(3) provides:

> A health technology not included as a covered benefit under a state purchased health care program pursuant to a determination of the health technology clinical committee under RCW 70.14.110, or for which a condition of coverage established by the committee is not met, shall not be subject to a determination in the case of an individual patient as to whether it is medically necessary, or proper and necessary treatment.

RCW 70.14.120(4) provides:

> Nothing in chapter 307, Laws of 2006 diminishes an individual's right under existing law to appeal an action or decision of a participating agency regarding a state purchased health care program. Appeals shall be governed by state and federal law applicable to participating agency decisions.

Also, section 6 of the bill, as originally passed by the legislature but vetoed by the governor, additionally provided, "The [HCA] administrator shall establish an open, independent, transparent, and timely process to enable patients, providers, and other stakeholders to appeal the determinations of the [HTCC]." 2 HOUSE JOURNAL, 59th

Leg., Reg. Sess., at 1201 (Wash. 2006); LAWS OF 2006, ch. 307, § 6 (vetoed). In her veto

message, Governor Christine Gregoire stated:

> I strongly support [the bill] and particularly its inclusion of language that protects an individual's right to appeal. Section 5(4) of the bill states that "nothing in this act diminishes an individual's right under existing law to appeal an action or decision of a participating agency regarding a state purchased health care program. Appeals shall be governed by state and federal law applicable to participating agency decisions." This is an important provision and one that I support whole-heartedly.
>
> I am, however, vetoing Section 6 of this bill, which establishes an additional appeals process for patients, providers, and other stakeholders who disagree with the coverage determinations of the [HTCC]. The health care provider expertise on the clinical committee and the use of an evidence-based practice center should lend sufficient confidence in the quality of decisions made. Where issues may arise, I believe the individual appeal process highlighted above is sufficient to address them, without creating a duplicative and more costly process.
>
> In the implementation of this bill, I expect the Health Care Authority, with the cooperation of participating agencies, to facilitate a timely and transparent process, to prioritize and manage the review of technologies with appropriated funds, and to meaningfully consider stakeholder feedback regarding the program and appeals processes. I further expect that the implementation of the Health Technology Assessment Program will be consistent with sound methods of assessment and the principles of evidence-based medicine.
>
> I appreciate the Legislature's passage of this bill and have full confidence that it will help ensure that Washingtonians receive health care services that are safe and effective.
>
> For these reasons, I have vetoed Section 6 of Engrossed Second Substitute House Bill No. 2575.
>
> With the exception of Section 6, Engrossed Second Substitute House Bill No. 2575 is approved.

2 HOUSE JOURNAL at 1587; *see also Joy v. Dep't of Labor & Indus.*, 170 Wn. App. 614,

625-26, 285 P.3d 187 (2012), *review denied*, 176 Wn.2d 1021 (2013).

HTCC's coverage determination

In 2010, the HTCC began its review of a controversial procedure—femoroacetabular impingement (FAI) syndrome hip surgery. FAI surgery is an invasive procedure in which a surgeon cuts off abnormal bone growths, removes damaged cartilage, and reshapes the femoral neck of the hip. Potential complications include avascular necrosis (cellular death of bone tissue), femoral head-neck fracture, deep infection, significant hip motion limitation, neurovascular injury, and symptomatic venous thromboembolism (blood clot).

HTCC conducted a one-year review process that included contracting with an evidence-based researcher who conducted a scientific assessment, holding public meetings, reviewing the scientific evidence, and providing an opportunity for formal public comment. The HTCC ultimately determined that the evidence weighed against FAI surgery, decided that it would not be covered, and noted that participating state agencies are "required to comply" with HTCC decisions. Admin. Record (AR) at 76-79. Since the HTCC decision, no one has requested that the HTCC revisit its FAI surgery determination. AR at 72; *see* RCW 70.14.100(2).

Chronology of Murray's case

Michael Murray sustained a hip injury while at work in August 2009. L&I allowed his claim and provided medical treatment. Murray's physician, Dr. James Bruckner, asked L&I to authorize surgery regarding Murray's hip condition, FAI syndrome. L&I denied payment for FAI surgery because the HTCC disallowed coverage for that procedure. L&I has not independently determined whether the FAI surgery is

6

medically proper and necessary. Dr. Bruckner performed the surgery on Murray without authorization from L&I. The FAI surgery purportedly successfully rehabilitated Murray's hip injury.

Murray appealed L&I's decision denying payment for the surgery to the Board of Industrial Insurance Appeals (Board or BIIA), which affirmed L&I. Murray appealed to the superior court, which affirmed the Board. Murray appealed to the Court of Appeals, which affirmed the superior court. *Murray v. Dep't of Labor & Indus.*, 1 Wn. App. 2d 1, 403 P.3d 949 (2017). The Court of Appeals held that the legislature constitutionally delegated its powers to the HTCC because sufficient procedural protections existed and because individuals could file writs of certiorari to obtain judicial review. *Id.* at 8-12. And "[b]ased on the plain language analysis of the statute," an "'HTCC noncoverage determination is a determination that the particular health technology is not medically necessary or proper in *any* case.'" *Id.* at 13 (quoting *Joy*, 170 Wn. App. at 624). Murray petitioned for review, which this court granted. 190 Wn.2d 1001, 412 P.3d 1262 (2018).

## ANALYSIS

### Standard of Review

This court reviews issues of statutory interpretation de novo. *Dep't of Ecology v. Campbell & Gwinn, LLC*, 146 Wn.2d 1, 9, 43 P.3d 4 (2002).

### Interplay of the HTA and the IIA

As noted, this case concerns the interplay of legislation creating the HTCC and the requirements of the IIA. As originally presented in the parties' briefing, the arguments focused on the propriety of the legislative delegation of authority to the HTCC to make

state health care coverage determinations. At oral argument, however, the parties' contentions evolved substantially, and in response, this court ordered the parties to submit additional briefing as follows:

> Considering the present workers' compensation context, in which the Industrial Insurance Act (IIA) provides workers with "sure and certain" relief for injuries on the job, RCW 51.04.010; *Department of Labor & Industries v. Lyons Enterprises Inc.*, 185 Wn.2d 721, 733, 374 P.3d 1097 (2016) (IIA's grand compromise provides workers with a swift, no-fault compensation system for injuries on the job), what is the legal significance of the governor's veto in this case? The parties should address what the language used in the veto means; how RCW 70.14.120(3) and .120(4) are to be applied in this case in light of the veto; and what remedy is available to Murray under RCW 70.14.120(3) and .120(4), in light of the Department of Labor and Industries' Medical Aid Rules (i.e., chapter 296-20 WAC, and regulations therein regarding medical coverage decisions—WAC 296-20-02700 through 296-20-02850), the IIA statutes providing for appeals (chapter 51.52 RCW), and any other relevant workers' compensation provisions concerning appeals of Department determinations and coverage decisions.

Order for Suppl. Briefing at 1-2.

In its response to the above order, the State contended that RCW 70.14.120(3) and .120(4) are not ambiguous when read together and, thus, the governor's veto message, which is legislative history, should be disregarded. The State's view is that L&I must comply with the HTCC coverage decision. RCW 70.14.120(1). As in the present case, where L&I makes no substantive coverage decision and merely applies the HTCC's categorical denial of coverage determination, upon any appeal of the L&I action denying the worker's claim, BIIA has nothing before it except L&I's application of the prior HTCC determination. Thus, BIIA can review only whether L&I's application of HTCC's coverage determination was proper, not HTCC's substantive coverage decision. Further,

the State asserts that the legislature's amendment of other HTA provisions after Division Two's decision in *Joy* (holding HTCC's noncoverage determination binds L&I and all reviewing bodies), without amending RCW 70.14.120(3) and .120(4), indicates legislative acquiescence in *Joy*'s interpretation of those provisions.[2]

Regarding the veto's significance in light of the IIA's sure and certain relief to injured workers, the State responds that under the IIA, workers get benefits as dictated by statute and that care is limited to "proper and necessary" care. *See* RCW 51.36.010(2)(a). That is, the HTCC's evidence-based coverage determinations promote uniform and safe treatment, in accord with determining what is proper and necessary under the IIA. Thus, in the State's view, the HTA shows legislative intent to adopt a binding and uniform evidence-based approach for care determinations.

Concerning the appropriate remedy, the State argues that workers have never had the right to get treatment that is barred by rule or coverage decision. *See* WAC 296-20-03002(6) (no coverage for controversial treatment). Accordingly, the State distinguishes *In re Pleas*, No. 96 7931 (Wash. Bd. of Indus. Ins. Appeals Aug. 31, 1998)

---

[2] As noted, the Court of Appeals here also relied on *Joy*, which held that (1) the governor's veto created conflicts among the health technology act statutes, (2) the lack of remedy for claimants denied coverage by L&I due to HTCC determinations is a problem for the legislature to address, and (3) the more specific statutes, RCW 70.14.120(1) (requiring participating agencies to comply with HTCC determinations) and RCW 70.14.120(3) (barring individual determination where HTCC has decided that a health technology is not covered), prevailed over RCW 70.14.120(4) (right to appeal under existing law unaffected), which *Joy* characterized as a more general statute. Further, *Joy* held that an HTCC determination of noncoverage binds L&I, and also binds BIIA and the superior court on review as well. 170 Wn. App. at 622-23. *Joy*, however, does not address L&I's medical aid rules (discussed *infra*) that we rely on herein, which were promulgated after the HTA enactment and which clarify the appropriate advisory role that HTCC provides to the Department. To the extent *Joy* is at odds with this decision, it is disapproved.

[https://perma.cc/FXB3-MJJU] (discussed *infra*). There, the treatment at issue was controversial and thus not covered under WAC 296-20-03002; but that rule allowed case-by-case exceptions. The State asserts there are no such exceptions here. *See* RCW 70.14.120(1) (L&I "shall comply" with HTCC coverage determinations).

The State contends that RCW 70.14.120(3) and .120(4) read together allow three challenges only: (1) that the HTCC determination does not apply, (2) that an exception listed in RCW 70.14.120(1) applies, or (3) that the HTCC's criteria for coverage is met. According to the State, only this reading harmonizes RCW 70.14.120(3) and .120(4), giving effect to all of the language in both provisions. We disagree.

Notably, the State's purported plain language approach ignores section RCW 70.14.120(4)'s express provision that "[n]othing in [this chapter] diminishes an individual's *right under existing law to appeal* an action or decision of a participating agency regarding a state purchased health care program." (Emphasis added.) Such existing law, the IIA, chapter 51.52 RCW, provides injured workers multiple layers of review to qualify for necessary and proper medical care. Under the IIA, L&I makes the initial coverage determination based on its "Medical Aid Rules." *See* WAC 296-20-02700 ("A medical coverage decision is a general policy decision by the director or the director's designee to include or exclude a specific health care service or supply as a covered benefit."), -02701 (L&I's "director or the director's designee makes medical coverage decisions"), -02703(1) (L&I's "*Medical Aid Rules* . . . specify covered and noncovered services and supplies."); *see also* RCW 51.36.010(1) (providers must follow L&I's coverage decisions).

10

The injured worker (or claimant or other aggrieved party) may then appeal L&I's decision to the BIIA. RCW 51.52.050(2)(a). Following a hearing on the appeal before an industrial appeals judge (IAJ) who is assigned to the case, the IAJ issues a proposed decision and order, which the IAJ files with the BIIA. RCW 51.52.104. The worker may then file a petition seeking review of the IAJ's proposed decision and order by a panel of the Board. *Id.*; RCW 51.52.106; WAC 263-12-145. Once the BIIA makes a final decision, the claimant may appeal to superior court. RCW 51.52.110.

The superior court reviews the BIIA's decision de novo, based only on the evidence presented to the BIIA. RCW 51.52.115. In such appeal to the superior court, "either party shall be entitled to a trial by jury upon demand." *Id.* From the superior court's decision, parties may appeal to the Court of Appeals and then to this court under the Rules of Appellate Procedure. RCW 51.52.140 (appeal shall lie from the judgment of the superior court as in other civil cases). Accordingly, the existing appeal rights preserved in RCW 70.14.120(4) provide an injured worker multiple layers of substantive review.

How can such robust appellate rights under the IIA be reconciled with the proscription in RCW 70.14.120(3) that an HTCC determination of noncoverage "shall not be subject to a determination in the case of an individual patient as to whether it is medically necessary, or proper and necessary treatment"? Murray answers that question by asserting that RCW 70.14.120(3) and .120(4) conflict, and thus urges this court to look to the legislature's and the governor's intent in adopting the HTCC legislation in order to

11

harmonize these provisions.[3] Murray correctly argues that both the legislature and the governor sought to protect workers' appellate rights, not diminish them. Indeed, the legislative history of the HTA program, that is, the various house and senate versions of the bill, all contained appeal provisions.[4] Moreover, the governor's veto message expressly relied on preservation of the "individual appeal process" to address any issues that may arise (seemingly protecting a worker's ability to establish coverage in a specific case). 2 HOUSE JOURNAL at 1587.

Murray also argues that he has a right under the Medical Aid Rules to prove FAI surgery (a controversial treatment) rehabilitated his hip. Under the Medical Aid Rules, while L&I normally will not pay for controversial treatment, a worker can, nevertheless, provide evidence to rebut the presumption against coverage. *See* WAC 296-20-01002 (defining "proper and necessary" and noting that controversial services are *presumed* to be *not* proper and necessary and will be authorized only as provided in WAC 296-20-

---

[3] The tension in these provisions indeed creates sufficient ambiguity to warrant consideration of legislative intent. *See In re Sehome Park Care Ctr., Inc.*, 127 Wn.2d 774, 778, 903 P.2d 443 (1995) ("When a statute is ambiguous, we attempt to determine the intent of the Legislature" and "[t]he legislative history of the statute is an important tool to ascertain intent.").

[4] *See* H.B. 2575 § 3(7), 59th Leg., Reg. Sess. (Wash. 2006); S.B. 6306 § 3(7), 59th Leg., Reg. Sess. (Wash. 2006); SUBSTITUTE H.B. 2575 § 3(6)-(7), 59th Leg., Reg. Sess. (Wash. 2006); SECOND SUBSTITUTE H.B. 2575 § 3(6)-(7), 59th Leg., Reg. Sess. (Wash. 2006); E2SHB 2575 § 3(6)-(7); and S. COMM. ON WAYS AND MEANS AMENDMENT TO E2SHB 2575, 59th Leg., Reg. Sess. (Wash. 2006) (rewriting the entire house bill, but retaining the house bill's core appeal provision and adding a separate, additional appeal provision at § 5(4) and § 6, respectively); *see also* FINAL BILL REPORT ON E2SHB 2575, at 3 (noting, "An appeals process is established for patients, providers, and stakeholders to appeal determinations of the Health Technology Committee," but also noting, "The Governor vetoed the requirement that the Administrator of the Health Care Authority establish a process for patients, providers, and other stakeholders to appeal coverage determinations of the health technology clinical committee").

03002(6) and -02850)); *see also* WAC 296-20-03002(6) (controversial treatment may be approved); -02850 (director may determine that controversial treatment is appropriate).[5]

We agree with Murray.

### Harmonizing the HTA and the IIA

Washington's workers' compensation law provides for "sure and certain relief for workers" in exchange for generally abolishing state court causes of action for personal injuries against employers. RCW 51.04.010; *see also Birklid v. Boeing Co.*, 127 Wn.2d 853, 859, 904 P.2d 278 (1995) (noting the IIA's "grand compromise"). Provisions of the IIA must be "liberally construed for the purpose of reducing to a minimum the suffering and economic loss arising from injuries . . . occurring in the course of employment." RCW 51.12.010. Courts are to resolve all doubts as to the meaning of the IIA in favor of coverage. *See Dep't of Labor & Indus. v. Lyons Enters., Inc.*, 185 Wn.2d 721, 734, 374 P.3d 1097 (2016). The "guiding principle" when interpreting provisions of the IIA is that "it is a remedial statute that is 'to be liberally construed in order to achieve its purpose of providing compensation to all covered employees injured in their employment, with doubts resolved in favor of the worker.'" *Id.* (quoting *Dennis v. Dep't of Labor & Indus.*, 109 Wn.2d 467, 470, 745 P.2d 1295 (1987)).

Injured workers' rights to benefits are statutory. *See McIndoe v. Dep't of Labor & Indus.*, 144 Wn.2d 252, 256, 26 P.3d 903 (2001). Under the IIA, an injured worker is

---

[5] This approach was applied in *Pleas* at 8, which noted that services that are controversial are *presumed* to not be medically necessary, but that such presumption may be rebutted by evidence of a successful treatment/surgery. (*Pleas* is more fully discussed *infra*.)

entitled to "receive proper and necessary medical and surgical services." RCW 51.36.010(2)(a); *see also Rogers v Dep't of Labor & Indus.*, 151 Wn. App. 174, 181, 210 P.3d 355 (2009). The legislature gave L&I authority to make rules regarding the provision of medical care and treatment. *See* RCW 51.04.020, .030; *see also Dep't of Labor & Indus v. Kantor*, 94 Wn. App. 764, 780, 783, 973 P.2d 30 (1999). Pursuant to this authority, L&I promulgated Medical Aid Rules in chapter 296-20 WAC, which address medical coverage under the IIA. The Medical Aid Rules provide that L&I shall pay for "proper and necessary medical care" (WAC 296-20-010(9)) and include a definition of "proper and necessary" health care services. WAC 296-20-01002; *see also Rogers*, 151 Wn. App. at 181-82; *Kantor*, 94 Wn. App. at 783. "Proper and necessary" refers to health care services that are (a) reflective of standards of good practice, (b) curative or rehabilitative, (c) not delivered primarily for the convenience of the claimant or health care providers, and (d) cost-effective. *See* WAC 296-20-01002; *Rogers,* 151 Wn. App. at 182. The Medical Aid Rules list specific provider types, services, and treatments that L&I will not authorize. *See* WAC 296-20-01505, -03002.

The definition of "proper and necessary" health care services in WAC 296-20-01002 states in subsection (4) that "[s]ervices that are controversial, obsolete, investigational or experimental are presumed not to be proper and necessary, and shall be authorized only as provided in WAC 296-20-03002(6) and 296-20-02850." WAC 296-20-03002(6) and 296-20-02850(1) provide that L&I will not allow or pay for treatment measures of a controversial, obsolete, or experimental nature, except "[u]nder certain conditions" when treatment may be approved.

In *Pleas* at 1, BIIA reversed and remanded to L&I with direction to issue an order authorizing payment for a spinal cord stimulator. BIIA granted review "in order to provide an analytical framework for determining what constitutes 'proper and necessary medical and surgical services' to which injured workers are entitled pursuant to RCW 51.36.010," because "[s]uch a framework is important to aid in uniformity in analysis of the facts and the applicable law." *Id.* at 1-2.[6] BIIA noted that L&I refuses to authorize spinal cord stimulator implants in all cases, based on the recommendation from its "Medical Advisory Industrial Insurance Committee," and reviewed medical testimony from L&I witnesses, who stated there was insufficient medical literature meeting scientific standards to show treatment was effective or leads to functional improvement of patients. *See id.* at 2-3. BIIA found that the treatment was "controversial" within the meaning of WAC 296-20-03002(6), so it must be presumed not to be medically necessary. *See id.* at 7. BIIA discussed how to analyze whether the treatment could be determined to be medically necessary:

> Since such treatment can be approved in certain cases, it follows that the presumption that it is not medically necessary can be rebutted. This regulation requires the Department to use a *case-by-case* analysis based on the definition of medically necessary found in WAC 296-20-01002.

*Id.* at 8 (emphasis added). Examining Pleas' individual case, BIIA held that the spinal cord stimulator was "proper and necessary medical and surgical services" within the

---

[6] The BIIA has designated *Pleas* as a "Significant Decision," indicating the Board considers *Pleas* to be a decision of substantial importance, containing analysis and guidance significant to the Board in carrying out its duties. *See* WAC 263-12-195(1).

meaning of WAC 296-20-01002. *See id.*[7] This was so because the claimant had proved that in her case the treatment had been rehabilitative. *Id.*

The Medical Aid Rules provide that a "medical coverage decision" is a decision by the L&I director (or the director's designee) to include or exclude a specific health care service as a covered benefit. *See* WAC 296-20-02700. The Medical Aid Rules provide that the director of L&I makes medical coverage decisions *(see* WAC 296-20-02701), the medical coverage decisions are used by L&I claim managers "to help them make claim-specific decisions" *(see* WAC 296-20-02702), and covered and noncovered medical services are specified in the Medical Aid Rules *(see* WAC 296-20-02703).

Under *Pleas,* if a particular medical treatment is not specified in the Medical Aid Rules as a treatment that is "not covered" by L&I, an injured worker has a right to an individual determination as to whether that particular medical treatment is proper and necessary treatment under RCW 51.36.010. FAI surgery is not specified in the Medical Aid Rules as a treatment or service that is excluded from coverage. *See* WAC 296-20-01505, -03002.

Further, the legislature created the HTCC in chapter 70.14 RCW in 2006. Following that enactment, L&I filed Medical Aid Rules that specifically reference the role of HTCC determinations in L&I's medical coverage decisions. WAC 296-20-01001 provides for the appointment of a medical advisory committee (MAC) that advises L&I

---

[7] "'While the Board's interpretation of the [IIA] is not binding upon this court, it is entitled to great deference.'" *Doty v. Town of South Prairie*, 155 Wn.2d 527, 537, 120 P.3d 941 (2005) (quoting *Weyerhaeuser Co. v. Tri*, 117 Wn.2d 128, 138, 814 P.2d 629 (1991)).

with respect to the development of coverage criteria and review of coverage decisions and technology assessments. *See* WAC 296-20-01001(2)(a). The MAC's function may include advising L&I "on coverage decisions from technology assessments based on the best available scientific evidence, from which the Department may use the committee's advice for making coverage decisions and for making proper and necessary industrial insurance claim decisions for covered services." WAC 296-20-01001(2)(d)(i). Subsection (4) provides that the MAC "shall coordinate with the state health technology assessment program," and that "[w]ith regard to issues in which the committee's [i.e., MAC's] opinion may differ with findings of the state health technology assessment program . . . the department must give greater weight to the findings of the state's health technology assessment program." WAC 296-20-01001(4).

More specifically, WAC 296-20-02704 lists sources of information L&I uses to make medical coverage decisions, which include, but are not limited to, recommendations from L&I's MAC and the HTCC. *See* WAC 296-20-02704(1), (3)(b). The regulation provides that because of the "unique nature of each health care service," the quality of information available may vary and the director "weighs the quality of the available evidence in making medical coverage decisions." *See* WAC 296-20-02704(1). Subsection (3) also expressly designates the HTCC as an "advisory committee" to L&I, stating in part, "As appropriate to the subject matter," the director's consideration of information in making coverage decisions "may include *recommendations* from the department's *formal advisory committees.*" WAC 296-20-02704(3)(b) (emphasis added).

17

The regulation then lists several such committees, including the MAC and "[t]he Washington state health technology assessment clinical committee." *Id.*

WAC 296-20-02705 provides that L&I may develop treatment guidelines in collaboration with specified committees, which include the Department's MAC and the HTCC. Subsection (3) provides that in implementing these guidelines, L&I may find it necessary to make a formal coverage decision on treatment options. "The department, *not the advisory committees* [which include the HTCC], is responsible for implementing treatment guidelines and *for making coverage decisions* that result from such implementation." WAC 296-20-02705(3) (emphasis added).

As can be seen, the Medical Aid Rules promulgated after the 2006 creation of the HTCC provide that HTCC determinations are one of several sources of information that L&I uses to make medical coverage decisions. While the HTCC determinations are given greater weight than MAC opinions, the regulations do not give HTCC determinations preclusive effect. Under the Medical Aid Rules, the Department, not the HTCC, remains responsible for medical treatment coverage decisions. Those Department medical coverage decisions are then subject to review before the BIIA and in superior court, pursuant to chapter 51.52 RCW, as discussed above.

Under this analysis, "an individual's right under existing law to appeal an action or decision of a participating agency regarding a state purchased health care program" remains undiminished. RCW 70.14.120(4). Harmonizing the legislation establishing the HTCC with the IIA in this fashion comports with the guiding principles in the L&I

18

context favoring compensation to injured workers and resolving doubts in favor of the worker.

Accordingly, for the reasons discussed above and consistent with *Pleas*, we hold that Murray is entitled to an opportunity to rebut the presumption that the controversial FAI surgery he received was not "proper and necessary" under the circumstances of his case. That is, Murray is entitled to an individual coverage decision by L&I, which is then subject to the appeal procedures of chapter 51.52 RCW. We reverse the Court of Appeals and remand Murray's reimbursement claim to L&I for a hearing on the merits in accordance with *Pleas*.

<u>Attorney fees</u>

Murray continues his request for an award of attorney fees on appeal. In the Court of Appeals, he sought fees under RAP 18.1(a) and RCW 51.52.130(1). RAP 18.1(a) allows a party to be awarded attorney fees provided for by statute. RCW 51.52.130(1) entitles a claimant to attorney fees if a decision of the Board is reversed or modified on appeal. Because we reverse and remand to L&I for a determination on the merits, we also award Murray attorney fees on appeal.

## CONCLUSION

We hold that applying L&I's Medical Aid Rules, HTCC determinations are one of several sources of information that L&I uses to make medical coverage decisions. While HTCC determinations are given considerable weight, the Medical Aid Rules do not afford such determinations preclusive effect. Under the Medical Aid Rules, L&I, not the HTCC, remains responsible for medical treatment coverage decisions. Accordingly, such

Department medical coverage decisions are then subject to review before the BIIA and in superior court, pursuant to chapter 51.52 RCW. We reverse the Court of Appeals and remand Michael Murray's reimbursement claim to L&I for further proceedings consistent with this opinion. We also award Murray attorney fees on appeal.

No. 95251-5

_Madsen, J._

WE CONCUR:

_Fairhurst, C.J._

_Johnson, J._

_Owens, J._

_Stephens, J._

_Wiggins, J._

_González, J._

_Gerht McCloud, J._

_Yu, J._

21